UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

ROBERT GERACE,

                       Plaintiff,

    -v.-                                          5:03-CV-166
                                                  (NPM/GHL)

UNITED STATES OF AMERICA,

                       Defendant.

_____

APPEARANCES                           OF COUNSEL:

COTE & LIMPERT                 JOSEPH S. COTE, III, ESQ.
Attorneys for Plaintiff
214 North State Street
Syracuse, NY   13203

OFFICE OF U.S. ATTORNEY - SYRACUSE    PAULA RYAN CONAN, ESQ.,
Attorneys for Defendant                  AUSA
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

NEAL P. McCURN, Senior District Court Judge

1

*Introduction* . . . . . . . . . 4

*Findings of Fact* . . . . . . . . . 5

*I.  July 1997* . . . . . . . . . 5

    *A.  July 7th - 10th SVAMC Hospitalization* . . . . 6

    *B.  July 23rd Cardiac Clinic Visit* . . . . . 8

    *C.  July 31st TEE* . . . . . . . 9

*II.  August 1997* . . . . . . . . 9

    *A.  Cardioversion* . . . . . . . . 9

    *B.  Stress Test* . . . . . . . . 10

    *C.  Holter Monitor* . . . . . . . 12

    *D.  Cardiac Catheterization* . . . . . . 13

*III.  September 1997 - Mitral Valve Repair* . . . . 14

*IV.  October 1997 - Cardiac Clinic Visit* . . . . 15

*V.  November1997* . . . . . . . 16

    *A.  November 24th Cardiac Clinic Visit* . . . . 16

    *B.  Roxbury Hospitalization* . . . . . . 18

*VI.  December 1997* . . . . . . . 18

    *A.  December 11th Cardiac Clinic Visit* . . . . 18

    *B.  Mid-December - Dr. Brand* . . . . . 20

    *C.  December 24th - Cardiac Clinic Visit* . . . . 20

    *D.  December 29th Cardiac Catheterization* . . . 21

    *E.  December 31st Coumadin Clinic Call* . . . . 21

*VII.  January 1998* . . . . . . . 22

    *A.  January 13th - 18th Roxbury Hospitalization* . . . 22

    *B.  January 21st - Cardiac Clinic Follow-up* . . . 22

*VIII.  February 1998* . . . . . . . . 24

    *A.   February 12th Stress Test*. . . . . . . 24

    *B.  February 23rd - SVAMC Hallway Encounter*. . . . 25

*IX.  March 1998* . . . . . . . . 26

    *A.  March 6th Addendum*. . . . . . . 26

    *B.  March 19th - SVAMC Hallway Encounter* . . . 27

    *C.  March 20th - Dr. Brand* . . . . . . 32

    *D.  March 21st - 28th SVAMC Hospitalization*. . . . 32

*Conclusions of Law* . . . . . . . 33

*I.  Governing Legal Standards* . . . . . . 33

    *A.  Which Law Applies?*. . . . . . . 33

    *B.  Medical Malpractice Elements* . . . . . 34

        *1.  Proximate Cause*. . . . . . . 35

    *C.  Burden of Proof* . . . . . . . 36

*II.  Application of Governing Legal Standards* . . . . 39

    *A.  Failure to "Make a Reasonable Investigation"* . . 39

        *1.  January 21, 1998* . . . . . . 39

        *2.  January 22 - February 16, 1998* . . . . 42

        *3.  February 17, 1998 - March 21, 1998* . . . 43

    *B.  Failure to Reinstate Anticoagulant Therapy* . . . 44

        *1.  Standard of Care* . . . . . . 44

        *2.  Departure from Standard of Care?* . . . 48

*III.  Proximate Cause* . . . . . . . 51

*Conclusion* . . . . . . . . 53

## *MEMORANDUM-DECISION AND ORDER*

### *Introduction*

On March 21, 1998, plaintiff Robert Gerace, a 46 year old Caucasian male, presented at the emergency room  ("ER") of the Syracuse Veteran's Administration Medical Center ("SVAMC"), where he was diagnosed has having had a stroke.

In this action, brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, plaintiff is seeking to recover nearly ten million dollars from the United States of America.  Plaintiff alleges that Dr. Kishor V. Phadke, his cardiologist at the SVAMC, "ignored and discounted plaintiff's symptoms and complaints, on a regular basis, and failed to institute appropriate anti-coagulation" when he was "suffering from paroxysmal atrial fibrillation[.]"[1]  Co. at 9, ¶46 (citation omitted) and ¶ 45 (footnote added).  This alleged failure to diagnose and treat plaintiff supposedly caused his to have a stroke which resulted in, among other things, "permanent and irreversible brain damage[.]" Id. at 45.

Prior to trial, the United States sought bifurcation of  the issues of liability and damage, a request which the court granted.  Doc. #68.  Following a five day non-jury trial confined to the issue of liability, the parties filed proposed findings of fact and conclusions of law.  After careful consideration of same, as well as the record evidence, the court makes the following findings of fact and conclusions of law as Fed. R. Civ. P. 52(a) requires.

---

[1]    Atrial fibrillation consists of "[v]ery rapid uncoordinated and ineffective contractions of the atria of the heart[,] resulting in an abnormally fast and highly irregular heartbeat." Ct. exh. 1.  Paroxysmal atrial fibrillation simply means "[a]trial fibrillation that comes and goes and does not persist[.]" Id.  The cardiologist who testified on behalf of the plaintiff, Dr. Michael D. Pressel, and the cardiologist who testified on behalf of the defendant, Dr. Stephen D. Nash, agreed that atrial fibrillation is "the most common heart rhythm abnormality in this country."  Doc. 84 at 20; and Doc. 81 at 115; 172; and 173.  "It affects roughly 2 million Americans[.]" Id. at 47; see also Doc. 81 at 115.

### *Findings of Fact*

Prior to his stroke, plaintiff had a history of cardiac problems.  In 1987, he was first diagnosed with mitral valve prolapse ("MVP").  Pl. exh. 17 at 1; Def. exh. A(17) at 135; and Pl. exh. 3 at 1; Def. exh. A(2) at 2.    MVP is "[a] valvular heart disorder in which one or both mitral valve[2] flaps close incompletely[.]" Ct. exh. 1 (footnote added). Dr. Nash, the defendant's expert cardiologist, classified plaintiff's disorder as being of "significant severity[.]" Doc. 84 at 13.  Plaintiff had a "very leaky mitral valve[.]" Id. That is a "bad problem to have[,]" according to Dr. Nash, because such a person will "have symptoms that will eventually go into heart failure[.]" Id.

Further complicating matters, in 1994 plaintiff had an EKG which showed "evidence of moderate mitral regurgitation[.]" Pl. exh. 5 at 1.  Mitral regurgitation ("MR") is the "[b]ackward flow of blood into the atrium due to mitral insufficiency." Ct. exh. 1.  Mitral insufficiency, in turn, means that the mitral valve is unable "to close perfectly, permitting blood to flow back into the atrium[.]" Id.  That 1994 diagnosis of mitral regurgitation was reaffirmed in early 1997.  See Pl. exh. 5 at 1.  Thus it stands to reason that when Dr. Phadke saw plaintiff for "new onset atrial fibrillation[,]" on July 24, 1997, he noted that plaintiff  "clearly had significant MR for a period of time[.]" Id.

### I.  July 1997

In January 1997, a private physician prescribed Acebutolol for plaintiff's complaints of heart palpitations.  Pl. exh. 3 at 1; Def. exh. A(2) at 2.  Later that year, in July 1997, plaintiff began to experience a "worsening of symptoms in terms of shortness of breath and episodes of palpitations which [were] increasing in frequency."

---

[2]       A mitral valve is "[a] valve in the heart that guards the opening between the left atrium and the left ventricle," which "prevents the blood in the ventricle from returning to the atrium[.]" Ct. exh. 1.

Id.    On July 2, 1997, while working as a registered nurse ("R.N.") at the SVAMC, plaintiff performed an EKG on himself.  Id.; see also Def. exh. A-1.  Although the EKG revealed that plaintiff had atrial fibrillation, Def. exh. A-1 at 1; Pl. exh. 2, he did not consult with a cardiologist or seek any type of medical attention at that time.

The following Monday, July 7, 1997, plaintiff returned to work at the SVAMC. While Wendy Ryan, another R.N., was reporting on the night shift which she had just completed, she noticed that plaintiff was gray in pallor.  Ms. Ryan testified that when she touched plaintiff's arm, he felt very sweaty.  She took his pulse and found it to be "irregular."  According to his chart, plaintiff was "dizzy, cold[,] clammy" and "light-headed."  Pl. exh. 1; Def. exh. A(2) at 6.  Nurse Ryan speculated that perhaps plaintiff's blood sugar was low.  She walked him to the ER.  Even though plaintiff was unsteady, Ryan testified that he refused to be transported by wheelchair.

### A.  July 7th -10th SVAMC Hospitalization

After being seen in the ER on July 7, 1998, plaintiff was admitted to the SVAMC where he stayed for three days.  His diagnosis was "new onset atrial fibrillation[,]" which was "increasing in irregularity or increasing in frequency of attacks[.]"  Pl. exh. 3 at 2; Def. exh. A(2) at 3.  To treat this atrial fibrillation "Cardiology" was "consulted[]" and "the plan was to heparinize" plaintiff and "anticoagulate him enough" until he could be "start[ed] on Coumadin[.]"  Id.

Although heparin and Coumadin are both anti-coagulants, they are administered differently and react somewhat differently in the body.  Heparin is a fast-acting and "relatively short-lived" anti-coagulant.  Doc. 84 at 9.  It is a "parenteral[;]" it is given intravenously.  Id. at 8.  In layperson's terms, heparin "thin[s] the blood."  Id.  More accurately, however, heparin is "used to *prevent* further clot formation[,]" or "to *prevent* a clot from forming in the first place."  Id. at 8 and 10 (emphasis added).  What

heparin does not do is dissolve  pre-existing clots.  Id. at 8 and 9.  As Dr. Nash succinctly put it, "heparin buys . . . time while our body dissolves the . . . clot itself." Id. at 10.  Thus, as Dr. Nash testified, "[t]heoretically[,]" if a patient presents with a clot and is then placed on heparin, "that clotting process stops[]" and "the body self-destroys or breaks down slowly much of the more friable form of thrombus."   Id. at 11. Significantly, the body's natural clot dissolving mechanism does not take place "immediately[.]"  Id.  Dr. Nash frankly stated that he "would suspect" that natural process "takes multiple days at a minimum."  Id.

Coumadin is an oral anti-coagulant which "is a slightly different mechanism than heparin[,]" and typically is administered after heparin.  Doc. 84 at 9.  As Dr.  Debra A. Buchan, the Medical Director of the Anticoagulation Center at the State University of New York ("SUNY") Upstate Medical University and a Clinical Associate Professor of Medicine there  explained it, Coumadin acts more gradually than does heparin.  She further explained that Coumadin is a vitamin K antagonist so that it decreases the production of protein, which in turn makes it less likely that a person will develop a blood clot  - an explanation which Dr. Nash endorsed.  See Doc. 84 at 9.

Coumadin is not without risks, however.  In fact because of the serious risks associated with it, a person on Coumadin requires regular monitoring.  See id. at 48. Regular monitoring is necessary so that a therapeutic level of anticoagulation is achieved, i.e. enough so that a person is "safe from thromboembolism[,]" but not so much that a person has a stroke due to "excessive anticoagulation[.]" Doc. 81 at 133; see also Doc. 84 at 52.   So even though Coumadin "lowers the risk of a blood-clot-derived stroke[,]" it "raises the risk of a bleeding type stroke."  Id.  Indeed, the "most feared complication," according to Dr. Buchan is intercranial bleeding.  If a person does not die from that, "most of the time they will end up with horrible neurological

7

deficits." Perhaps that is why Dr. Buchan somberly described the risks associated with Coumadin in this way: "Clotting is an act of God, but bleeding is my fault."

According to the discharge summary, after plaintiff had maintained therapeutic levels with the Coumadin, he was to "return in 2-4 weeks maximum to" have a transesophageal echocardiogram ("TEE").  Pl. exh. 3 at 2; Def. exh. A(2) at 3.  A TEE is done  using "an ultrasound probe [which] is passed orally into the patient's esophagus, producing very clear images of the heart structures and valves[.]" Ct. exh. 1. If the TEE did not show "any thrombi in the left atrium," Pl. exh. 3 at 2; Def. exh. A(2) at 3, the plan was to cardiovert him, *i.e.* apply "electric shock in order to restore normal heartbeat[.]" Ct. exh. 1.

### B.  July 23rd Cardiac Clinic Visit

Plaintiff first became Dr. Phadke's  patient on July 23, 1997.  Prior to that they had known each other,  however.  They had a professional relationship in that plaintiff worked as a registered nurse at the SVAMC, and at times he had worked with Dr. Phadke.  Plaintiff testified that while working along side Dr. Phadke he observed that the doctor seemed to get along well with his patients, and his patients seemed to do well.  Therefore, when he needed to follow-up with a cardiologist after his July 1997 discharge, of the three full-time cardiologists on staff at the SVAMC, plaintiff chose Dr. Phadke because in plaintiff's words, Dr. Phadke was "supposed to be the best."

During his initial consult on July 23, 1997, plaintiff reported that although "his palpitations ha[d] improved a lot[,]" his  breathing was "still quite" difficult or labored "on effort and [he] fe[lt] generally weak and tired."  Pl. exh. 5 at 1; Def. exh. A(4) at 38. In keeping with the  original discharge plan, Dr. Phadke decided that plaintiff should have a TEE, the purpose of which  was "mainly to look at the mitral valve apparatus . . . to diagnose or exclude chordal rupture."  Id.  If the TEE revealed such a problem, Dr.

Phadke indicated that the "best plan would be to perform cardiac cath[eterization] . . . to assess [plaintiff] for mitral valve surgery[.]" Id. at 2; id. at 39.  Parenthetically Dr. Phadke added that  plaintiff's mitral valve might "be suitable for repair[.]" Id.

### C.  July 31st TEE

As per Dr. Phadke's orders, plaintiff had a TEE on July 31, 1997.  See Pl. exh. 6 at 1; Def. exh. A(5) at 44.   The TEE reaffirmed plaintiff's EKG from earlier that month, showing, among other things, that he had "severe mitral regurgitation[.]" Id. at 2; id. at45; see also Doc. 84 at 56.   The TEE further revealed that although plaintiff did not "have any thrombi in the left atrium[]" of his heart, that atrium was somewhat enlarged.  See  Doc. 82 at 10; see also Pl. exh. 6.  Giving these findings and others, Dr. Phadke arranged for a cardioversion.  Pl. exh. 6 at 1; Def. exh. A(5) at 44.  After that, Dr. Phadke's plan was to "reassess" plaintiff in Cardiac Clinic in approximately 10 days "to see if his  symptoms [we]re better."  Id.  If plaintiff did not have improvement after the cardioversion, Dr. Phadke wrote that he "should undergo cardiac catheterization." Id.

## II.  August 1997

### A.  Cardioversion

The cardioversion was not done until "several weeks after [plaintiff] was discovered to be in atrial fibrillation and had been released from the hospital[,]" because, as Dr. Pressel agreed, "it [is] not safe to do caridoversion for a patient with atrial fibrillation until he has been anticoagulated for at least three weeks[.]" Doc. 81 at 129. Among other reasons, it is not safe to do a cardioversion until then  "because when you do the caridoversion, the changing the heart rhythm back into sinus rhythm might in fact release a clot if there was one present in the left atrium[.]" Id.

According to the "doctor's progress notes," initially the cardioversion was

"unsuccessful." Pl. exh. 7;  Def. exh. A(6) at 48.  A second cardioversion done a short time later was "success[ful,]" however, in that plaintiff was returned to "normal sinus rhythm," and his "atrial fibrillation [wa]s absent." Id.; Def. exh. A(6) at 51.  Coumadin was among the medications which he was ordered to take when he was discharged later that same day.  See id.; Def. exh. A(6) at 49.  Plaintiff continued on Coumadin until September 7, 1997, a few days prior to his mitral valve repair.  See Pl. exh. 13 at 1; Def. exh. A (14) at 97.

### *B.  Stress Test*

On August 8, 1997, plaintiff was scheduled to undergo a stress test with an EKG.  A stress test is an "electrocardiographic test of heart function before, during, and after a controlled period of increasingly strenuous exercise. . . such as on a treadmill[.]" Ct. exh. 1.  Dr. Phadke  wanted plaintiff to have such a test to "objectively assess [plaintiff's] exercise tolerance once [he was] in sinus rhythm."  Pl. exh. 10 at 1;  Def. exh. A(8) at 61.    The  test  had  to  be  discontinued when plaintiff began to feel "lightheaded" and became short of breath, at which point he "presented himself to the ER."  Id.  The ER "data sheet" indicates that plaintiff's "chief complaint" at that time was "chest pain[.]" Def. exh. A(8) at 57; Pl. exh. 9 at 1.  "[O]bjective[ly]" he appeared to the nurse to be "extremely anxious[.]" Id.  In fact, "anxiety" is listed as the "nursing diagnosis[]" upon his admission to the ER.  Id.  At plaintiff's request, he was seen by Dr. Phadke later on the 8th of August.  Def. exh. A(8) at 60.

According to Dr. Phadke's notes,"[c]linical examination when [plaintiff] was symptomatic showed[,]" among other things, "normal sinus rhythm[,]" leading Dr. Phadke to "rul[e] out a significant arrhythmia or hypotension as the cause for [plaintiff's] symptoms."  Id. at 61; Pl. exh. 10 at 1.  In those August 8, 1997, progress notes, Dr. Phadke wrote that he "discussed" the foregoing with plaintiff, but "he denied

10

feeling anxious or panicky during the episode[.]" Id.  Further, plaintiff reported that "he had been having similar symptoms ever since the cardioversion except for about one day when he felt really well." Id.  Dr. Phadke's notes continued, plaintiff "is still quite [short of breath] on effort and continues to get chest pain which does not sound cardiac." Id.  Plaintiff "also describe[d]" to Dr. Phadke "one episode of palpitations" id., when he had what Dr. Pressel characterized as a "discordant pulse[.]" Doc. 81 at 48. That means that the pulse rates between the neck and wrist are different.  A discordant pulse occurs because a pulse coming from the heart is  "so diminished by the time it gets to the wrist[,]" as compared to the neck, "that you really don't palpate them[.]" Id. A discordant pulse can be indicative of an arrhythmia, and atrial fibrillation is the most common arrhythmia.  See id. at 172 and 173.

Dr. Phadke candidly wrote that in light of the foregoing, he was "not sure of the cause of [plaintiff's] symptoms."  Pl. exh. 10 at 1; Def. exh. A(8) at 61.  Dr. Phadke considered "[p]aroxysmal atrial fibrillation" as "a possibility[,]" but noted that "during [the] symptoms [plaintiff] was in sinus [normal] rhythm."   Id. This testimony is in keeping with Dr. Pressel's opinion that it was "fair to say" that if whatever happened to plaintiff during the August 8, 1997, stress test "was atrial fibrillation, it was extremely fleeting[.]"  Doc. 81 at 120.

In any event, given his uncertainty as to the cause of plaintiff's symptoms on August 8, 1997, Dr. Phadke thought it "best to perform left and right heart catheterization and coronary angiography[,]" which was scheduled for August 19, 1987. Pl. exh. 10 at 1;  Def. exh. A(8) at 61.  More immediately, Dr. Phadke "arranged for" plaintiff to wear a Holter monitor for 24 hours starting later in the day on August 8, 1997.  Id.  A Holter monitor is "[a] portable device that makes a continuous record of electrical activity of the heart and . . . can be worn by an ambulatory patient during the

11

course of daily activities[.]" Ct. exh. 1.  Dr.  Phadke advised plaintiff "to keep a diary of all of his symptoms[]" while he was wearing the Holter monitor.  Id.  Dr. Pressel agreed with Dr. Phadke's planned course of treatment at this point, *i.e.* the Holter monitor, cardiac catheterization and coronary angiography.  Doc. 81 at 120-21.    **C**

**Holter Monitor**

During the 24 hours in which he wore the Holter monitor, plaintiff wrote in his diary that he had three episodes of dizziness; six instances of being short of breath, and three times when he experienced "chest discomfort/pain[.]"  See Def. exh. A(9) at 64.  When questioned about the significance of these symptoms, Dr. Pressel initially testified that plaintiff had " a couple of runs of supraventricular tachycardia of which he *could have had* a couple of brief runs of atrial fibrillation."  Doc. 81 at 57 (emphasis added).   On cross-examination Dr. Pressel was compelled to agree however that plaintiff's reported symptoms while on the Holter monitor did *not* show "any evidence of atrial fibrillation."  Id. at 127 and 128.

Likewise, Dr. Nash "agree[d]" that "there [wa]s no atrial fibrillation marked" while plaintiff was wearing the Holter monitor.  Doc. 84 at 63.  By the same token though, while wearing that  monitor plaintiff did have "two different forms of heart rhythm," which from Dr. Nash's viewpoint "could conceivably explain the palpitations[.]" Id. at 70.  Furthermore, on cross-examination Dr. Nash conceded that even though a patient does not have palpitations while wearing a Holter monitor, that does not necessarily rule out that he may be "suffering from paroxysms of atrial fibrillation[.]" Id. at 64.

**D.  Cardiac Catheterization**

As scheduled, on August 19, 1997,[3] plaintiff Gerace had "[a] right and left cardiac catheterization . . . to define the severity of the mitral regurgitation and detect any coronary artery disease."  Def. exh. A(10) at 85.  In his "Cardiac Catheterization Report," Dr. Kalla noted that plaintiff "continues to have symptoms of palpitations, dyspnea on exertion and chest pressure[,]" id., symptoms which Dr. Phadke agreed were "consistent with the symptoms [plaintiff] expressed when he . . . was in A fib[]" in early July.  Doc. 82 at 38.  Even Dr. Pressel agreed that plaintiff's MVP and mitral valve regurgitation were a "sufficient physical basis to explain" those symptoms.  Doc. 81 at 135.

Dr. Kalla further noted that "at the beginning of the" catheterization plaintiff "complain[ed] of mild shortness of breath."  Def. exh. A(10) at 86.  Additionally, according to the "attending note" signed by Dr. Phadke,  he stated that "[d]uring the cath [plaintiff] complained of dyspnea on a number of occasions when he was clearly hyperventilating[.]"  Id. at 90.

Following that catheterization, Dr. Kalla concluded that plaintiff had "[n]o coronary artery disease[,]" and "[n]ormal LV systolic function[.]"  Id. at 87.  However, plaintiff did have "[s]evere 4+ mitral regurgitation" and "[m]ild pulmonary hypertension."  Id.  "Because of the severity of mitral regurgitation, LV dilatation and the one episode of atrial fibrillation," Dr. Phadke recommended that plaintiff have a mitral valve repair.  Id. at 90; see also Def. exh. A(10) at 87.

### III.  September 10th - 18th Mitral Valve Repair

---

[3]     On the Cardiac Catheterization Report, which was signed by Dr. Kalla, a Fellow in Cardiology, but not signed by Dr. Phadke, he gives the date of the catheterization as August 15, 1997.  Def. exh. A(10) at 86.  All the other pertinent medical records, as well as Dr. Phadke's testimony, indicate that that procedure was performed on August 19, 1997, and the court so finds.

On September 12, 1997, plaintiff underwent elective mitral valve repair surgery. This surgery was done at the West Roxbury, Massachusetts VAMC ("Roxbury") because there was no cardiac surgery available at the SVAMC. Doc. 82 at 94. Also, Dr. Phadke "preferred" Roxbury to the other possible VAMC facilities because the surgeon at Roxbury handled "patients with complicated problems . . . easily." Id. at 94-95. In Dr. Phadke's estimation the Roxbury surgeon obtained "very good results[.]" Id. at 94.

As his chart from this hospitalization states, plaintiff "tolerated the [mitral valve repair] well[.]" Def. exh. A(14) at 98A. Drs. Pressel, Nash and Phadke all agreed that the surgery was "successful[.]" Doc. 81 at 137; see also Doc. 84 at 21; and Pl. exh. 15; and Def. exh. A(15) at 130. Four days post-surgery, plaintiff did have "a brief episode of atrial fibrillation[.]" Def. exh. A(14) at 98A. As Dr. Pressel conceded on cross-examination though, such "brief periods of atrial fibrillation are [n]ot at all uncommon" following this type of cardiac surgery. Doc. 81 at 138. Indeed, brief episodes of atrial fibrillation "happen[] all the time," he agreed. Id. Dr. Pressel observed that "the most likely explanation for this brief period of atrial fibrillation . . . was the postsurgical phenomenon[.]" Id.

Dr. Nash concurred:  Post-operative atrial fibrillation is a "very common event . . . after open heart surgery" because this is "a very aggressive" type of surgery. Doc. 84 at 19. Elaborating, Dr. Nash continued that because this "is a very delicate operation[,] . . . [i]t is not unusual, due to the amount of inflammation that is created, the amount of cutting that occurs, various changes in body fluids that occur in the few days after, for a heart rhythm abnormality to occur known as atrial fibrillation." Id. at 20. So, in Dr. Nash's opinion, "the most likely reason for th[is] episode of atrial fibrillation" was "[t]he mitral valve repair on the . . . basis of having mitral

14

regurgitation." Id.

Plaintiff's brief episode of atrial fibrillation was "controlled by optimization of [plaintiff's] medications as well as electrolytes[,]" def. exh. A(14) at 98A, which Dr. Pressel stated is the "usual[] . . . way" of addressing this symptom. See Doc. 81 at 138. After that, plaintiff "remained stable and in sinus rhythm without any further arrhythmia" until he was discharged on the sixth day after his surgery, with plans to be followed up at ths SVAMC. Def. exh. A(14) at 98A. At the time of discharge, plaintiff was on four medications, but not Coumadin. See id.; see also Def. exh. A(17) at 137. He was on Lopressor "probably to lower his blood pressure and also to help him to stay in normal sinus rhythm[,]" Dr. Pressel surmised. Doc. 81 at 139. Dr. Phadke added that one of the reasons Lopressor, a beta-blocker, is given post-operatively "is to prevent atrial fibrillation[.]" Doc. 82 at 99. It is "a cardio protective drug[,]" which "slows down the heartbeat[,]" and is "routinely given to the vast majority of patients after heart surgery." Id. Plaintiff continued on this Lopressor in October and November of 1997. Id. at 139. Upon discharge from Roxbury, plaintiff also was on enteric-coated aspirin, which Dr. Pressel testified is "good for everybody[.]" Doc. 81 at 140. In addition plaintiff was on Lovastatin to lower his cholesterol, and Darvocet for pain. Id.

## IV.  October 22, 1997 - Cardiac Clinic Visit

At the October 22, 1997, follow-up to the mitral valve repair, Dr. Phadke wrote in his progress notes that plaintiff was "feel[ing] very well"[;] his "venous pressure [wa]s normal"[;] his "lungs [we]re clear and [his] ECG [wa]s within normal limits." Def. exh. A(15) at 130; Pl. exh. 15. Dr. Phadke could "not hear a murmur" in plaintiff's heart, an absence which he deemed to be "very good." Id. Plaintiff was not complaining of any shortness of breath; nor did he have any palpitations. In light of the foregoing, Dr. Nash declared that there would be "no reason to do . . . an investigation"

into whether plaintiff "was in atrial fibrillation."  Doc. 84 at 109.

Dr. Phadke concluded his progress notes from that visit by stating that plaintiff should have a "stress echo" test "in about four weeks[.]" Pl. exh. 15; Def. exh. A(15) at 130.  If the results of that test were "satisfactory[,]" Dr. Phadke indicated that plaintiff could "return to work."  Id.  Dr. Phadke ordered a "stress echo" test because it is the most objective way of evaluating . . . exercise ability[;]" it serves as a "guide" to a patient's "symptoms, if they have any, and after mitral valve repair, it will tell you how the repair is[.]" Doc. 82 at 103.

Dr. Pressel concurred that this was an appropriate course of action for Dr. Phadke to follow.  See Doc. 81 at 143.  He further agreed that as of the date of this follow-up visit, it seemed "as though the cause of plaintiff's symptoms since July of '97 had been successfully addressed with the mitral valve repair[.]" Id. at 142.

### V.  November 1997

#### A.  November 24th Cardiac Clinic Visit

Plaintiff enjoyed roughly two symptom-free months after his mitral valve repair.  Id. at 73.  Unfortunately that changed in November, 1997.  As planned, plaintiff was seen in the SVAMC Cardiac Clinic on November 24, 1997, for a "stress echo[.]" Pl. exh. 16 at 1;  Def. exh. A(16) at 132.  That baseline EKG revealed a "large pericardial effusion[,]" id., which is "[a]n accumulation of unwanted fluid in the space between the inner and outer layers of the pericardium[.]" Ct. exh. 1.  After being notified of this, Dr. Phadke  went to see the plaintiff himself.  See Pl. exh. 16 at 1; Def. exh. A(16) at 132. Plaintiff reported to Dr. Phadke that "for the last three weeks or so, he ha[d] been feeling increasingly short of breath and [had] started to take Lasix[4] on his own without

---

[4]        Lasix is "a diuretic tending to increase the excretion of urine, thereby reducing fluid retention in the body[.]" Ct. exh. 1.

consulting [with Dr. Phadke] or telling [him] about it." Id. (footnote added).  Even with the Lasix, plaintiff reported that his shortness of breath "ha[d] not improved[,]" although he did not have any chest pain.  Id. Dr. Phadke ordered a chest x-ray which ruled out pleural effusion.  See id.; see also Doc. 81 at 145.  Based upon the foregoing, Dr. Phadke opined in this progress notes that because it was "[s]o far out from surgery," plaintiff "likely [had] Dressler's syndrome."  Pl. exh. 16 at 2;  Def. exh. A(16) at 132. Dressler's syndrome  "essentially . . . occurs where there is irritation of the lining of the heart[.]" Doc. 84 at 27.  It "is a well-recognized complication of experiences like heart surgery."  Id.

Dr. Pressel agreed that "shortness of breach is the cardinal symptom of a large pericardial effusion[,]" and further that there is "[n]o question" that that "effusion is ample and sufficient explanation" for plaintiff's reported shortness of breath.  See Doc. 81 at 149.  Based upon his knowledge of plaintiff's medical situation as of November 24, 1997, Dr. Pressel further agreed "that there was no indication for [plaintiff] to be on any kind of anticoagulation[.]" Id. at 150.  In fact, Dr. Pressel testified that it was "potentially true[]" that had plaintiff been "on Coumadin . . . in November of 1997, that would have . . . made [the] Dressler's syndrome, the pericardial effusion, a far more dangerous phenomenon[.]" Id.   Indeed, if a person has a pericardial effusion, anticoagulation therapy is contraindicated.  See id.  Dr. Pressel was not alone in his opinion.  Dr. Buchan went so far as to state that had plaintiff been anticoagulated when he developed this bloody pericardial effusion in November 1997, he could have died.

### B.  Roxbury  Hospitalization

One day after his November 24, 1997, follow-up with Dr. Phadke, plaintiff was once again admitted to Roxbury; this time to evaluate and treat his pericardial effusion.

Pl. exh. 19 at 1; Def. exh. A(18) at 149.   This effusion was treated through pericardiocentesis, a surgical process whereby the pericardium is punctured "especially to aspirate pericardial fluid[.]"  See Ct. exh. 1.   A total of three liters of fluid was removed from plaintiff's pericardium.  See Def. exh. A(19). Plaintiff also "underwent [a] cardiac catheterization" while at Roxbury.  Def. exh. A(18).  However, he did not have a pericardiectomy, which is "[t]he surgical excision of the pericardium or portions thereof[,]" Ct. exh. 1, because during preoperative preparation, his "right-sided pressures . . . were normal[,]" thus obviating the need for this procedure.  See Def. exh. A(17).  In contrast to after his mitral valve repair, plaintiff did not have even a brief episode of atrial fibrillation following this procedure.  See Doc. 81 at 157.

## VI.  December 1997

### A.  December 11th Cardiac Clinic Visit

After that pericardiocentesis surgery, on December 11, 1997, plaintiff returned to the SVAMC Cardiac Clinic for a stress test, which Dr. Phadke had previously arranged.  See Pl. exh. 19 at 1; and Def. exh. A(18) at 149.   Plaintiff did not undergo that test, however, because "of echo and clinical findings." Pl. exh. 19 at 2; Def. exh. A(19) at 150.  More specifically, plaintiff reported to Dr. Phadke that "he was not feeling any better and was short of breath on effort even on climbing one flight of stairs." Id. at 2;  Def. exh. A(18) at 149.  During this visit plaintiff did not complain of "palpitations or pulse discrepancies or anything of that nature." Doc. 81 at 152.  Rather, his complaint was limited to shortness of breath as just described.

An EKG administered that same date showed that there was still "a small to moderately large circumferential pericardial effusion[,]" although it "ha[d] diminished in size considerably[]" since plaintiff's November 24, 1997, EKG.  Pl. exh. 19 at 2; Def. exh. A(19) at 150.  In light of the foregoing, Dr. Phadke spoke with the Roxbury

cardiac surgeons who agreed with him that "there [wa]s clinical evidence suggesting constriction" and that plaintiff "should [be] give[n] a trial of medical therapy with NSAIDS [Non Steroidal Anti-Inflammatory Drugs] and if necessary[,]" steroids[.]" Pl. exh. 19 at 1; Def. exh. A(18) at 149 (footnote added).   The rationale for pursuing this course of treatment was "to see if the effusion (due to presumed Dressler's) as well as [the] clinical evidence of constriction [would] resolve spontaneously." Id.

Dr. Phadke further noted that if plaintiff "continues to have problems despite" that medication, a "pericardiectomy would be considered." Id.  According to the doctor's progress notes, he "explained all [of] this to" the Geraces. Id.  Once again, plaintiff's expert cardiologist Dr. Pressel agreed that Dr. Phadke's planned course of treatment, in conjunction with the Roxbury surgeons, was  "perfectly appropriate[.]" Doc. 81 at 152. Dr. Pressel elaborated that a trial period of NSAID therapy was "a very appropriate move to make because plaintiff was "not in tamponade, he only ha[d] a . . . moderately large pericardial effusion, and if it [wa]s due to Dressler's syndrome, which is, . . . , an inflammation of the sac, if you put the patient on high doses of anti-inflammatory drugs such as . . . NSAID[s][,] . . . many times that will take care of the problem[] . . . without the need for further surgical intervention." Id. at 87.

Despite the fact that at this point in his treatment of plaintiff Dr. Phadke had ordered a TEE, two stress tests, a cardiac catheterization, a coronary angiography, a Holter monitor, a mitral valve repair and pericardiocentesis, plaintiff's wife, also a R.N. at the SVAMC, testified that he "ke[pt] telling Dr. Phadke that he was going in and out of A Fib and Dr. Phadke just ke[pt] blowing him off." Doc. 78 at 7 (internal quotation marks omitted); see also id. at 9.  The record evidence outlined above belies this contention.  What is more, even plaintiff's expert cardiologist, Dr. Pressel, conceded, "[E]verything that was done by Dr. Phadke . . . , I think in general w[as] appropriate."

Doc. 81 at 169-70.

### B. Mid-December 1997 - Dr. Brand

On December 16, 1997, plaintiff was seen by Dr. Frank Brand, an internist at the SVAMC.  Dr. Brand noted that plaintiff had increased shortness of breath, but no chest pain.  Pl. exh. 27 at 4; Def. exh. A(20) at 151.  Plaintiff's chest was clear and he was in sinus rhythm.  Id.  Dr. Brand was uncertain as to whether he or Dr. Phadke ordered an EKG, but he testified that at that point he "certainly" would have wanted one done to determine if there was fluid from the effusion which was interfering with the functioning of plaintiff's heart.  Two days later, on December 18, 1997, plaintiff did have had another EKG where it was found, among other things, that he had a "small to moderate sized circumferential pericardial effusion[.]"  See Def. exh. A(21) at 152.

### C.  December 24th Cardiac Clinic Visit

Plaintiff returned to Dr. Phadke on December 24, 1997, informing the doctor that he "fe[lt] no better" and that he was "still quite short of breath on exertion."  Pl. exh. 20 at 1;  Def. exh. A(22) at 153.  Plaintiff further "complain[ed] of pain in the left side of his chest which [wa]s intermittent and of unclear origin."  Id.  That pain was "not related to effort."  Id.  Given these "continuing symptoms," Dr. Phadke "arrang[ed] for [plaintiff] to have [a] repeat cardiac catheterization[.]"  Id.

After this catheterization, Dr. Phadke wrote that a decision would be made as to whether to refer plaintiff back to Roxbury "if appropriate."  Id. Because he "was concerned that [plaintiff's condition] needed to be addressed surgically[,]" Dr. Phadke contacted two surgeons at Roxbury.  See Doc. 82 at 113; see also Pl. exh. 20 at 1; Def. exh. A(22) at 153.  In addition, "[w]hile waiting for the [cardiac] catheterization," Dr. Phadke "asked [plaintiff] to reduce the dose of Prednisone [which he had been taking] to 10 [milligrams] daily."  Id.  Again, Dr. Pressel agreed that this "was a perfectly

20

appropriate, necessary" way of trying to ascertain what was happening with plaintiff's heart.  Doc. 81 at 154.

### D.  December 29th Cardiac Catheterization

Plaintiff had a second cardiac catheterization on December 29, 1997, "to confirm the diagnosis of" constrictive pericarditis," which is a "thickening of the membrane . . . which makes the pericardium stiff." Doc. 82 at 116 and 113.  When this happens, the heart cannot "expand out." Doc. 81 at 155.     The catheterization confirmed that diagnosis.  Def. exh. A(23) at 154.  Therefore, in consultation with  two Roxbury surgeons,  Dr. Phadke recommended that plaintiff undergo a pericardiectomy there. Doc. 82 at 119.

### E.  December 31st Coumadin Clinic Call

Based upon a progress note which she signed on December 31, 1997, Dr. Tammy Anthony, Director of the SVAMC's Anticoagulation "Coumadin" Clinic, testified that she called the Geraces on December 31, 1997, to discuss the fact that supposedly plaintiff had an international normalized ratio ("INR") level of 1.08.  See Def. exh. A(24) at 169.  An INR is a standard for monitoring anticoagulation therapy, as Dr. Anthony explained.  It is measured in terms of how long it takes blood to clot in a test tub.  For most patients, Dr. Anthony testified that a 2.0 - 3.0 INR is a normal therapeutic range, although sometimes those numbers can increase to 2.5 - 3.5 depending upon the reason for the anticoagulation in the first place.

Given that a normal therapeutic range is 2.0 - 3.0, Dr. Anthony testified that she was "concerned" about plaintiff's supposed INR level of 1.08.  However, when Dr. Anthony called the Gerace residence, she spoke with plaintiff's wife, who informed her that plaintiff "ha[d] been taken off warfarin by Dr[s]. Brand and . . . Phadke[.]" Id. On that progress note which Dr. Anthony signed, it further states that plaintiff was "no

longer in a. fib."  Id.

### VII.   January 1998

#### A.  January 13th - 18th Roxbury Hospitalization

On January 13, 1998, plaintiff was admitted to Roxbury  for a pericardiectomy, Pl. exh. 21 at 1; Def. exh. A(26) at 171, which consisted of the "creat[ion] [of] two large windows in the right and left atrium to allow the heart room to expand[.]" Doc. 81 at 157; see also Def. exh. A(26) at 174.  The purpose of this surgery was to "permanently relieve the possibility that [plaintiff] was going to suffer from Dressler's syndrome[.]" Doc. 81 at 88.   As was the case with his November 25 - December 3, 1997, hospitalization, there was no documentation of plaintiff h aving experienced atrial fibrillation while at Roxbury in January 1998.  Id. at 157.

#### B.  January 21st Cardiac Clinic Follow-up

On January 21, 1998, plaintiff returned to the SVAMC Cardiac Clinic for a follow-up visit with Dr. Phadke.  During that visit plaintiff reported that "his shortness of breath d[id] not feel any better[.]" Pl. exh. 22 at 1; Def. exh. A(27) at 178.  He further reported that he was "especially breathless" when "bend[ing] down[,]" and that he was "short of breath on walking[,]" although "since it [had been] so soon after the last operation," plaintiff told Dr. Phadke that he had "not been active."  Id.; see also Doc. 82 at 119.  According to Dr. Phadke, during this visit plaintiff did not complain of heart palpitations. Doc. 82 at 122.  Nor did plaintiff tell the doctor that he was "going in and out of A fib[.]"  Id.   Indeed, Dr. Phadke did not "discern any abnormalities in the rhythm of [plaintiff's] heart."  Id. at 124.

Plaintiff's wife agreed that this was an accurate assessment of plaintiff's condition at that time.  See Doc. 78 at 12.  Mrs. Gerace further agreed that Dr. Phadke "did not find anything of a cardiac nature . . . that he discussed with [her] and her

husband[.]" Id. at 13-14.

When questioned as to how he knew that plaintiff did not complain of palpitations or of "going in and out of A fib" on January 21, 1998, Dr. Phadke testified that it was his practice to "document everything." Id. at 122. He described his "practice in the clinic" in some detail. Id. He "would speak with [a] patient, examine the patient and wr[i]te a note immediately thereafter[.]" Id. "[S]o," he continued, "if a patient ever complained of palpitations to [him], there was absolutely no reason for [him] not to write that in the chart and not to make a record of that, . . . because [he] recorded everything at the same time. . . . that [he] was seeing the patient." Id.   It was easy to do that because each exam room had a computer.  See id. at 71.

Dr. Phadke also wrote in his January 21, 1998, progress notes that he "encouraged [plaintiff] to start increasing his activities[.]" Pl. exh. 22 at 1;  Def. exh. A(27) at 178.  Further, Dr. Phadke explicitly noted that he "had a long discussion with [plaintiff] and his wife about [plaintiff's] symptoms[,]" and "[l]ike in the past," Phadke "believe[d] that the sensation of [shortness of breath] [wa]s due to anxiety[.]" Id.  Dr. Phadke held that belief even though plaintiff "deni[ed] it." Id. This is wholly consistent with Mrs. Gerace's recollection of this visit. See Doc. 78 at 13.

During cross-examination, Dr. Phadke persuasively reasoned that shortness of breath can have "various connotations." Doc. 82 at 120. Thus, in Dr. Phadke's opinion shortness of breath from climbing stairs has a "totally different connotation" than does shortness of breath which occurs while bending down. Id. The latter is indicative of anxiety when, as in plaintiff's case, there was no "abnormality on examination[.]" Id. Given that normal examination, Dr. Phadke further testified that he thought that plaintiff "was anxious from the surgery, [that he] had not completely recovered and [that he] needed to start activities." Id. Dr. Phadke acknowledged that anxiety is "very

23

common[]" in cardiac patients.   Id.   Similarly,"[s]hortness of breath is not an uncommon symptom" of which cardiac patients complain.   See id. at 120-21.

At the same time, however, Dr. Phadke was quick to acknowledge that shortness of breath does not "necessarily" have to be caused by one "thing or [an]other[.]" See id. at 121.   However, because plaintiff was "complaining of shortness of breath on exertion," Dr. Phadke scheduled a stress test for him.   Id.   If that stress test were to show that plaintiff had "good exercise tolerance," Dr. Phadke wrote that he thought plaintiff could "return to work," although he would be restricted for three months in terms of not being able to do any heavy lifting.   Pl. exh. 22 at 1; Def. exh. A(27) at 178. Dr. Phadke planned to "review [plaintiff] himself after the stress test."   Id.

## VIII.  February 1998

### A.  February 12th Stress Test

Dr. Phadke  performed plaintiff's stress test on  February 12, 1998.   Doc. 82 at 124.  He "conclu[ded]" that plaintiff had "good exercise tolerance."  Def. exh. A(28) at 179.  Also, plaintiff was "negative for ischemia[;]" id. in other words, his heart was getting sufficient blood.  See Doc. 84 at 36.

After this stress test, Dr. Phadke determined that plaintiff could "return to work on 2/17/1998."  Pl. exh. 23 at 1;  Def. exh. A(28) at 180.  Because of plaintiff's "recent operation,"  Dr. Phadke did place some restrictions upon his return to work, such as no heavy lifting.  See id.  After two months of working with those restrictions, Dr. Phadke planned to "review [plaintiff] himself"  and "[i]f he [was] doing OK . . . , he [could] resume his usual work."  Id. In addition, Dr. Phadke  "encouraged [plaintiff] to continue to walk on a regular basis[.]"  Id.

### B.  February 23rd - SVAMC Hallway Encounter

Plaintiff's wife testified that "shortly after [plaintiff] returned to work[]" on

February 17, 1998, perhaps on February 23, 1998, she and plaintiff were standing in a hallway at the SVAMC when Dr. Phadke walked by them. Doc. 78 at 16 and 18.  As Mrs. Gerace remembers it, the three of them had a "discussion" in the hallway, which was "long enough for [plaintiff] to relate to Dr. Phadke that he was having episodes of atrial fibrillation that lasted up to 20 minutes." Id. at 16.  She thought that it was "important to relay" this information to Dr. Phadke given that plaintiff did not have an appointment scheduled with the doctor for another two months. Id. at 17. Mrs. Gerace claims that Dr. Phadke said "nothing and walked away." Id. at 18.

On February 23, 1998, although Dr. Brand did not recall who was present, Mrs. Gerace testified that she and her husband both saw him on that day. See id. at 18. Looking at plaintiff's "Medication Profile," Dr. Brand confirmed that he prescribed aspirin for plaintiff that day. See Pl. exh. 27 at 9.  Beyond that, Dr. Brand was not sure of exactly what else happened during that five to ten minute encounter  because, as he candidly testified, it was  "long ago[.]" At one point Dr. Brand testified that plaintiff himself described having "spells," yet at another  point he testified that he was not sure whether plaintiff was even there.  It might have been just plaintiff's wife.  What can be gleaned from Dr. Brand's testimony, however, is that plaintiff and/or his wife advised the doctor that plaintiff was having "spells" where he would have shortness of breath and fatigue. Those spells were described to Dr. Brand as "suddenly coming on and then suddenly going away[.]"   Dr.  Brand believed that what was being described to him was "likely episodic A. fib[.]"

Although Dr. Brand could not remember the precise  details of this conversation, the "gist" of it was that Dr. Phadke was not listening to the plaintiff and his wife when they described these spells.  Dr. Brand told plaintiff that he needed to return to Dr. Phadke and "insist" that he listen because in Dr. Brand's view, plaintiff's situation

required a cardiologist's judgment for possible treatment.  The Geraces agreed to return to Dr. Phadke.

The foregoing comports with Mrs. Gerace's recollection as to what transpired when she and plaintiff saw Dr. Brand on February 23rd.  Either she or plaintiff advised Dr. Brand that plaintiff was "going in and out of A fib," and they asked for a prescription for aspirin, thinking that it would act as anticoagulant.

Other than suggesting that plaintiff needed to consult with Dr. Phadke again, Dr. Brand did nothing else.  He did not follow up in any way.   By his own admission, he did not, for example, call Dr. Phadke or another SVAMC cardiologist to make him aware of these spells.  He did not review plaintiff's medical records.  In fact, he did not know that plaintiff had achieved good exercise tolerance during his February 12, 1998, stress test.  Dr. Brand justified not requesting a cardiac consult by noting that plaintiff was already under the care of Dr. Phadke, a cardiologist.  Dr. Brand  made no notes of this February 23, meeting.  See Doc. 78 at 18.

### IX.  March 1998

#### A.  March 6th Addendum

On  March 6, 1998, Dr. Phadke entered an "addendum" to his February 12, 1998, progress note because plaintiff had "asked" Dr. Phadke to "recommend" that he not "work[] night shifts and late shifts" because these shifts were "quite stressful[]" to plaintiff.  Pl. exh. 23; Def. exh. A(29) at 181.  Given that "it [wa]s still early after [plaintiff's] recent [surgery]," Dr. Phadke "recommend[ed]" that plaintiff  "be given responsibilities which [were] not very stressful[.]" Id.  He further "recommend[ed]" that plaintiff "avoid[] long shifts and night shifts . . . for at least another 6 weeks or so."  Id.

Dr. Phadke had "no independent recollection" of this March 6, 1998 meeting.  Doc. 82 at 67.  Nor did he have an independent recollection of any of the symptoms of

which plaintiff may have complained at that time.  Id.  When challenged about this, Dr. Phadke testified  that if plaintiff "had reported . . . on that occasion that he was having palpitations or what he thought were bouts of atrial fibrillation," he "most certainly [would have] written that down[]" and "examined [plaintiff] at the very least."  Id. at 68; see also id. at 129.

The court finds this testimony credible especially taking into account Dr. Phadke's testimony that he "often saw patients" and had an "ad hoc conversation like that . . . in the place which is right next door to the stress test room[,]" making it easy to "examine the patient and . . . make a note of that in the computer."  Id. at 128. Lending further credibility to Dr. Phadke's testimony is his observation that "computers were ubiquitous in the VA at that time[;]" he was "very familiar with the [SVAMC] computer system," and the doctor's testimony that it was his practice to take notes on the computer while a patient was with him.  Id. at 131.

### B. March 19th SVAMC Hallway Encounter

Even though Mrs. Gerace was uncertain as to the exact date of the February "discussion" in the hallway with Dr. Phadke, she was sure that she and plaintiff had a similar conversation with the doctor on March 19, 1998.  Doc. 78 at 15.  Given that this was just three days prior to plaintiff's stroke, a date which is undoubtedly permanently imprinted on her mind, it is easy to see why Mrs. Gerace could be sure of this date.

During this conversation which, as Mrs. Gerace recalls it, also took place in the hallway at the SVAMC, plaintiff informed Dr. Phadke that he had worked the evening of March 17, 1998, and that he had awakened the next morning, March 18, 1998, in atrial fibrillation.  On direct examination Mrs. Gerace testified that plaintiff told Dr. Phadke that he did not know how long that episode lasted, but for "*at least* 45 minutes." Mrs. Gerace's recollection was slightly different on cross-examination.  She testified

27

that plaintiff told Dr. Phadke "that he woke up in A fib and it lasted for 45 minutes." Id. at 19.

Mrs. Gerace also vacillated somewhat as to whether plaintiff was actually in atrial fibrillation when he spoke with Dr. Phadke on March 19th.  Initially Mrs. Gerace did not recall whether at that time plaintiff told Dr. Phadke that the atrial fibrillation was gone. See id.  When confronted with an affidavit from another legal proceeding, [5]  however, Mrs. Gerace  admitted that plaintiff did inform Dr. Phadke of that.  See id. at 19-23. Further, according to Mrs. Gerace , as with the mid-February "discussion" with Dr. Phadke, on March 19, 1998, he looked at them and said nothing despite plaintiff's claim of atrial fibrillation.  Mrs. Gerace was confident that Dr. Phadke had heard  plaintiff reporting symptoms of atrial fibrillation, but when pressed,  she could not say how she knew that.

These discrepancies as to potentially medically significant facts, *i.e.* the length of time during which plaintiff experienced atrial fibrillation and whether he was in that state when the Geraces were speaking with Dr. Phadke on March 19th, diminish the weight of Mrs. Gerace's testimony.  If Mrs. Gerace was a novice concerning  medical care, these discrepancies might be inconsequential.  She is not though.  Both Mrs. Gerace and plaintiff are relatively sophisticated consumers of medical services.  Not only are they both R.N.s, but both of them have worked as cardiac nurses at the SVAMC.

Dr. Phadke acknowledged speaking to plaintiff at least once in March, but as discussed earlier he denies that plaintiff complained of atrial fibrillation.  Furthermore,

_____

[5]     On November 30, 1999, Mrs. Gerace filed an affidavit as part of a New York Court of Claims action which she and plaintiff had filed against the State of New York.  See Co., exh. X thereto.  That Court of Claims action pertains to the events of which plaintiff is complaining herein.

Dr. Phadke was adamant that plaintiff did not tell him that he was in atrial fibrillation at any time between January 21 and March 19, 1998.  As set forth above, plaintiff is equally adamant that on at least two occasions, once in mid-February 1998 and again on March 19, 1998, he and his wife told Dr. Phadke that plaintiff was "going in and out of A fib," but Dr. Phadke ignored them. Naturally, the plaintiff and Dr. Phadke argue that the other's version of events is not credible.  Having had the opportunity to hear the witnesses' testimony and carefully observe their demeanor, the court does not see such a stark contrast however.

The court finds it entirely plausible that plaintiff and his wife did have two encounters with Dr. Phadke at the SVAMC, outside a clinical setting.  One such encounter, as Mrs. Gerace testified, was in February, shortly after plaintiff's February 17, 1998 return to work; and the other was on March 19, 1998.  On the other hand, it is not reasonable to conclude that the substance of those conversations was as Mrs. Gerace recounts them.  Taking into account Dr. Phadke's attentive care of plaintiff in the preceding six months or so, as discussed herein, it is inconceivable that the doctor would have completely ignored plaintiff if at those times he had been reporting, as he claims, that he was "going in and out of A fib."

 The more likely scenario, based on this record, is that during the two brief, chance encounters the Geraces had  with Dr. Phadke it was not clearly communicated to him that plaintiff was having palpitations and/or "going and out of A fib."  Dr. Nash realistically described the "hallway of the hospital where [he] works" as "crazy[,]" with people say[ing] things all the time and messages [not] necessarily always [being] intact."  Doc. 84 at 90.  Certainly that could have been the situation at the SVAMC in mid-February and on March 19, 1998.

The court's finding that these two encounters did not unfold exactly as the

Geraces suggest is bolstered by several other factors.  First, at either of those times it would have taken almost no effort for Dr. Phadke to have immediately responded to plaintiff's symptoms.  Unlike some other medical facilities, at the SVAMC the "ECG Department is right there."  Doc. 82 at 132.  Additionally, "[p]utting the patient on a Holter monitor requires no effort whatsoever because the technician is there[.]" Id. Furthermore, the SVAMC is staffed 24/7.  See id.  Thus, given the close proximity of the ECG Department, the stress test room, which is located about 25 feet from Dr. Phadke's office on the sixth floor, id. at 112, and the 24/7 staffing, it simply is not reasonable to conclude that Dr. Phadke would not have acted upon plaintiff's atrial fibrillation complaints if he had been aware of them.  Neither is it reasonable to conclude that nurses who are knowledgeable about cardiac issues and the workings of the SVAMC Cardiac Department, would stand silently by and allow Dr. Phadke to completely ignore them -- not once, but supposedly twice.  This is all the more so if they truly believed, as Mrs. Gerace testified, that Dr. Phadke heard plaintiff when he told him about the atrial fibrillation.

Second, what became patently obvious during the trial is that there is what can best be described as a personality conflict between Dr. Phadke and the Geraces – a conflict which pre-dates this litigation.  Mrs. Gerace frankly testified that "[i]n the beginning, [she] didn't have a problem with Dr. Phadke, but as time went on, [she] didn't like him basically for the reason that every time [she] suggested something or made a comment, he seemed very put off by that."  Doc. 78 at 23.  At one point, she confronted Dr. Phadke directly, stating, "you and I have never liked each other[.]" Id. at 24.  In fact, relatively early on in Dr. Phadke's care and treatment of plaintiff, on August 19, 1997, Mrs. Gerace freely admitted that she was "disenchanted" with Phadke. Id.

30

Plaintiff first became a patient of Dr. Phadke's less than a month before when he saw Dr. Phadke as a follow-up to his early July 1997, emergency room admission. Between that July 23, 1997, follow-up appointment and August 19, 1997, Dr. Phadke ordered a TEE, a cardioversion, a stress test, a Holter monitor, a left and right catheterization, and coronary angiography for plaintiff.  In light of that, the basis for Mrs. Gerace's "disenchant[ment]" with Dr. Phadke at this point is not clear, to say the least.

The logical explanation for this "disenchant[ment]" may well be a personality conflict.  On the stand Dr. Phadke was at times abrupt, bordering on arrogant.   Thus, it is possible to see how the Geraces may have perceived him as being dismissive.  This is a two-way street, however.  Given the Geraces' relative sophistication regarding cardiac problems, it is also easy to see how Dr. Phadke might have perceived them as challenging his authority.  The Geraces' knowledge, while in and of itself obviously is beneficial, in this setting is illustrative of the maxim that a little bit of knowledge can be a dangerous thing.  Perhaps for that reason, Dr. Phadke may not have communicated with the Geraces in a manner which they interpreted as responsive.  To conclude, scrutinizing the entire record and carefully observing the demeanor of the Geraces and Dr. Phadke, the court finds, as Mrs. Gerace recalls, that they did have two brief encounters with Dr. Phadke – one in mid-February 1998, and the other on March 19, 1998.  By the same token, however, the court cannot find by a preponderance of the evidence that as a matter of fact Dr. Phadke was made aware of plaintiff's complaint of atrial fibrillation during either of those chance meetings.

### C.  March 20th - Dr. Brand

On March 20, 1998, Dr. Brand saw plaintiff again.  During that unscheduled visit, Dr. Brand wrote the following on a "security prescription form[:] [P]laintiff is having

probable bout of atrial fib after working evenings. Plese [sic] do not schedule for off shift. Dr. Phadke agrees." Pl. exh. 25. Dr. Brand admitted that he was not sure whether plaintiff actually described himself as having atrial fibrillation, but that is what Brand thought it was. Dr. Brand explained that he wrote this to assist plaintiff's wife, who had stopped by to get the paperwork she needed to get plaintiff an accommodation for his work schedule. This correlates with Mrs. Gerace's memory of this "quick [unscheduled] visit[.]"

Prior to writing this prescription, Dr. Brand did not review plaintiff's medical records in any form. Moreover, when he wrote "Dr. Phadke agrees[,]" Dr. Brand testified that he meant that Dr. Phadke agreed that plaintiff's work schedule should be adjusted – not that Phadke agreed that plaintiff was "having [a] probable bout of atrial fib[.]" Id. This makes sense given Dr. Phadke's March 6, 1998, addendum previously mentioned.

### D.  March 21st - March 28th SVAMC  Hospitalization

On March 21, 1998, while plaintiff was at home with his wife, "he experienced the sudden onset of dizziness, left-sided headaches, and loss of vision in the right visual field. Def. exh. A(31) at 183. In addition, plaintiff reported that a few days earlier he had "palpitations." Id. Later that day, when he was admitted to the SVAMC emergency room, his "CT scan showed no infarct or bleeding[,]" and his "EKG[6] showed [a] normal sinus rhythm." Def. exh. A( 31) at 184; 203; and 204 (footnotes added). Despite those normal findings, on plaintiff's discharge summary, Dr. Andrew C. Bragdon, a neurologist and Director of the SVAMC's Epilepsy Program, wrote this "impression[]" of plaintiff's condition: "It appeared [plaintiff] had developed

---

[6]     An EKG is "[t]he tracing made by an electrocardiograph when monitoring the electrical activity of the heart[.]" Ct. exh. 1.

intermittent atrial fibrillation, probably an intra-atrial thromus [sic], and thrown an embolus to a posterior branch of his left middle cerebral artery causing an infarct in the temporal-parietal-occipital region of his left hemisphere." Id. at 184.

### *Conclusions of Law*

### *I.  Governing Legal Standards*

#### *A.  Which Law Applies?*

In the present case, plaintiff is alleging medical malpractice and negligence[7] against Dr. Phadke, who at the time of the events complained of herein was a cardiologist employed by the SVAMC.  The FTCA is the exclusive remedy for such claims against a veteran's administration employee such as Dr. Phadke; 28 U.S.C. § 2679(b)(1) (West 1994), and jurisdiction properly lies with this district court.  See 28 U.S.C. § 1346(b)(1) (West Supp. 2005).  "Under the FTCA, the liability of the United States for the negligence acts of its agents is governed by the law of the state in which the alleged negligence occurred." Ford v. United States, No. 98 CV 6702 (THK), 2000 WL 1745044, at *4 (S.D.N.Y. Nov. 27, 2000) (citing 28 U.S.C. § 1346(b)(1)).  Because the medical malpractice alleged herein occurred at the Syracuse, New York VAMC, New York law governs.  See id.

#### *B. Medical Malpractice Elements*

"To establish a prima facie case of liability in a medical malpractice action, a plaintiff must prove (1) the standard of care in the locality where the treatment occurred, (2) that the defendant breached that standard of care, and (3) that the breach was the

---

[7]     Although "no rigid analytical lines separate[] the two[,]" Gerry v. Behr, No. 98-CV-4820, 1998 WL 782015, at *2 n. 2 (E.D.N.Y. Nov. 6, 1998) (citations omitted), "[c]onduct will be deemed medical malpractice, rather than negligence, when," as here, "it constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician[.]" Edbauer v. Harris Hill Nursing Facility, 667 N.Y.S.2d 573, 574 (4th Dep't 1997) (internal quotation marks and citations omitted).

proximate cause of the injury[.]" <u>Fernandez v. Elemam</u>, 809 N.Y.S.2d 513, 514 (2nd Dep't 2006) (internal quotation marks and citations omitted); <u>see</u> <u>also</u>   <u>Flemming v. City of New York</u>, No. 02 CV 6613, 2006 WL 898081, at *5 n.2 (E.D.N.Y. March 31, 2006) (internal quotation marks and citation omitted) ("In order to present a prima facie case of medical malpractice [under New York law], a plaintiff must show, *inter alia*, that his or her injuries proximately resulted from the defendant's departure from the required standard of performance."). [E]xcept  as to matters within the ordinary experience and knowledge of laymen, . . . expert medical opinion evidence is required" to satisfy each of these elements. <u>Milano v. Freed</u>, 64 F.3d 91,  95 (2d Cir. 1995) (internal quotation marks and citations omitted). Furthermore, plaintiff must prove each of these elements by a preponderance of the evidence. <u>Metzen v. United States</u>, 19 F.3d 795, 807 (2d Cir. 1994). "A preponderance of the evidence is defined as the burden of persuading the trier of fact that the existence of the fact is more probable than its non-existence." <u>People  v. Jones</u>, 805 N.Y.S.2d 807, 809 (Co. Ct., Dutchess Co. 2005) (citing <u>Dempsey v. Methodist Hospital</u>, 159 A.D.2d 541, 552 N.Y.S.2d 406; PJI 1:23; *Richardson on Evidence*, 11th Edition, § 3-206)).

Under New York law, there are . . . three component duties which a physician owes his patient, i.e., (1) a duty to possess the requisite knowledge and skill such as is possessed by the average member of the medical profession; (2) a duty to exercise ordinary and reasonable care in the application of such professional knowledge and skill; and (3) the duty to use his best judgment in the application of this knowledge and skill." <u>Jones v. United States</u>, 720 F.Supp. 355, 367 (S.D.N.Y. 1989) (internal quotations and citations omitted); <u>see</u> <u>also</u> <u>Metzen v. United States</u>, 19 F.3d 795, 807 (2d Cir. 1994) (citations omitted) (same). A physician is not liable, however, "solely for a poor result." <u>Jones v. United States</u>, No. 83 Civ. 6785, 1986 WL 1459, at *4

(S.D.N.Y. Jan. 28, 1986).  Thus, "[t]he existence of an undesirable result alone does not constitute malpractice."  Id. at *6.  All that the law requires is that a physician " use the skill and learning of the average physician [in his field], to exercise reasonable care and to exert his best judgment in the effort to bring about a good result."  Id. at *4 (internal quotation marks and citations omitted).

Before examining whether plaintiff has shown by a preponderance of the evidence each element of a medical malpractice claim against Dr. Phadke, there are two preliminary legal issues which plaintiff raises.  The first pertains to the issue of proximate cause and the second pertains to the burden of proof.  The court will address these issues *seriatim*.

### 1.  Proximate Cause

With respect to the issue of proximate cause, plaintiff claims, and the court agrees, that he has the burden of proving by a preponderance of the evidence that defendant's breach of the standard of care was "a substantial factor" in causing his stroke.  See Wong v. Tang, 769 N.Y.S.2d 381, 382 (2nd Dep't 2003) (citations omitted). Stated somewhat differently, a plaintiff must offer evidence from which reasonable persons could conclude that it was "more probable than not" that the injury was caused by the doctor's malpractice.  Mortensen v. Memorial Hospital, 483 N.Y.S.2d 264, 270 (1st Dep't 1984) (citations omitted).  Importantly, "the substantial factor need not be the only cause which produces the injury."  Id. (citation omitted).  In other words, "[a] plaintiff is not required to eliminate every other possible cause."  Id. (citation omitted). Thus, the fact "[t]hat another possible cause concurs with a defendant's negligent act or omission to produce an injury does not relieve a defendant from liability if the plaintiff shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred."  Id. (internal

quotation marks and citation omitted).  By the same token, "[h]owever, where an [injury] is one which might naturally occur from causes other than a defendant's negligence the inference of his negligence is not fair and reasonable."  Id. (internal quotation marks and citations omitted).

The Court of Appeals has recognized that "[t]he issue of causation in medicine is always difficult but, when it involves the effect of a failure to follow a certain course of treatment, the problem is presented in its most extreme form."  Toth v. Community Hosp. at Glen Cove, 292 N.Y.S.2d 440, 446 (1968).  In such a case, the New York Court of Appeals has further recognized that it "can then only deal in probabilities since it can never be known with certainty whether a different course of treatment would have avoided the adverse consequences."  Id.   In any event, what is clear is that "[t]he burden . . . of proving causation *always* remains with the plaintiff."  Mortensen, 483 N.Y.S.2d at 270 (emphasis added).

Applying the foregoing framework to the present case means that plaintiff Gerace has the burden of proving, *inter alia*, by a preponderance of the evidence not only that Dr. Phadke departed from accepted standards of medical care, but also that such departure was a substantial factor in causing plaintiff's stroke.

### *C.  Burden of Proof*

Plaintiff Gerace asserts that because he sustained neurological deficits including loss of memory from the stroke, and because that stroke was caused by Dr. Phadke's malpractice, he "is entitled to a reduced burden of proof[.]" Doc. 88 at 29.  For that same reason, plaintiff further asserts that the "burden of explanation," id., *i.e.*, demonstrating the cause of his stroke, is on the defendant.  See id.

In making this argument, plaintiff relies heavily upon the seminal case of Noseworthy v. City of New York, 298 N.Y. 76 (1948), wherein the Court of Appeals

held that because the decedent was unavailable to testify he was "not held to as high a degree of proof as where an injured plaintiff can himself describe the occurrence." Id. at 80.  In that wrongful death action plaintiff alleged that a subway operator was negligent in failing to stop his train in sufficient time to avoid hitting plaintiff's intestate.  The Noseworthy Court adopted that lesser burden of proof "based on the consideration . . . that where the management and control of the thing which has produced the injury is exclusively vested in the defendant, it is with his power to produce evidence of the actual cause that produced the accident, which the plaintiff is unable to present."  Id. at 80-81 (internal quotation marks and citations omitted). Further, the Court of Appeals reasoned, "[In fact,] it is a general rule of evidence, applicable to every sort of case, that where the defendant has knowledge of a fact but [sic] slight evidence is requisite to shift on him the burden of explanation." Id. (internal quotation marks and citations omitted).

In Schecter v. Klanfer, 321 N.Y.S.2d 99 (1971), another case upon which plaintiff Gerace heavily relies, the Court of Appeals extended the Noseworthy rule to amnesiacs, reasoning that "an amnesiac plaintiff can no more describe the occurrence that produced his injury than can a plaintiff's decedent, a toddler or an imbecile." Id. at 102 (internal quotation marks omitted).  Recognizing that "amnesia is easily feigned[,]" however, the Schechter Court held that to ameliorate that danger, the "[p]laintiff has the burden of proof on the issue of amnesia as on other issues." Id. at 103.  Thus, "[a] jury should be instructed that before the lesser burden of persuasion is applied, because of the danger of shamming, they must be satisfied that the evidence of amnesia is clear and convincing, supported by the objective nature and extent of any other physical injuries sustained, and that the amnesia was clearly a result of the accident." Id.

In Sawyer v. Dreis & Krump Manufacturing Co., 502 N.Y.S.2d 696 (1986), the Court of Appeals took the Schechter ruling one step farther and held that expert evidence is "required" for a plaintiff to prove amnesia by clear and convincing evidence. Id. at 699 (citations omitted). Expert evidence is necessary, explained the Sawyer Court because "without the aid of [such], a jury of lay[people] is not capable of evaluating the effects of a trauma or the symptoms which may verify the loss of memory and indicate that it is real and not feigned." Id. at 700.

Significantly, the lesser burden of proof to which amnesiacs are entitled does *not* "shift the burden of proof or eliminate the need for plaintiffs to introduce evidence of a *prima facie* case." Schechter, 28 N.Y.2d at 233; see also Wald v. Costco Wholesale Corporation, 2005 WL 425864, at *7 (S.D.N.Y. Feb. 22, 2005) (internal quotation marks, citation and footnote omitted) ("[A] plaintiff rendered unable to remember or testify about the facts of his injury" is "not excuse[d] . . . from making out a prima facie case where he bears the burden of production. Rather," the Noseworthy doctrine "permits a jury greater latitude in drawing inferences favorable to plaintiff."). Thus, regardless of whether plaintiff Gerace is an amnesiac, it is incumbent upon him in the first instance to establish a *prima facie* case of medical malpractice against Dr. Phadke. As will be seen, because plaintiff has not done that here, there is no need to consider whether he has come forth with "clear and convincing [expert] evidence that he suffers from amnesia caused by the [stroke][.]" Nahvi v. Urban, 687 N.Y.S.2d 398 (2d Dept. 1999) (citation omitted).

The first step in deciding whether plaintiff has met his burden of proving that Dr. Phadke departed from accepted standards of medical care is to identify those alleged departures, and the time frames in which they allegedly occurred. Plaintiff is claiming that Dr. Phadke departed from accepted standards of medical care in two separate but

closely related ways.  Prior to trial plaintiff claimed that "Dr. Phadke should have treated [plaintiff] for the reoccurrence of atrial fibrillation by prescribing anticoagulation therapy to reduce the risk of stroke."  Doc. 70 at 2.[8]  Post-trial, plaintiff expanded upon that theory by further asserting that Dr. Phadke departed from accepted standards of medical care because he did not "make [a] reasonable investigation[]" into plaintiff's complaints, and because he did not "make an appropriate diagnosis[,]" of same, *i.e.* atrial fibrillation.  See Doc. 88 at 12, n.9 and 15.  The court will address these theories in reverse order.

## II.  Application of Governing Legal Standards

### A.  Failure to "Make a Reasonable Investigation"

A painstaking review of Dr. Pressel's testimony,  shows that while for the most part Dr. Pressel did not find fault with the care which Dr. Phadke rendered here, in a few narrow instances Dr. Pressel  *did* testify that Dr. Phadke departed from accepted standards of medical care.  As will soon become apparent,  however, Dr. Phadke's opinions are based upon a number of unsupported factual and legal assumptions.

### 1.  January 21, 1998

On January 21, 1998, three days after his discharge from Roxbury for his pericardiectomy, Dr. Phadke saw plaintiff.  As detailed above, during that visit plaintiff complained of shortness of breath upon exertion.  Doc. 82 at 121.  When asked whether he had "an opinion within a reasonable degree of medical certainty if in the face of [that] unexplained symptom [of shortness of breath]" on that date  "further evaluation" was " mandated[,]" Dr. Pressel replied, "[C]learly it [wa]s."  Doc. 81 at 91.  Dr. Pressel continued, on that date plaintiff "*probably* needed to have "another Holter monitor, . . .

---

[8]     For ease of reference, the court took the liberty of numbering the pages of this submission.

. *perhaps* an event recorder,[9] . . . maybe . . . some basic laboratory studies to make sure the patient, for example, is not anemic, does not have thyroid disease, those sorts of things." Id. (emphasis added).

Assume for the sake of argument that the standard of care in Syracuse, New York on January 21, 1998, required further investigation of plaintiff's symptoms using the diagnostic tools Dr. Pressel suggested.[10]  Even with the benefit of that assumption, the court cannot find under the circumstances presented here that Dr. Phadke departed from accepted standards of medical care by not undertaking further investigation using a Holter monitor and/or an event recorder on that date. "Although no particular words need be uttered, an expert's opinion must be expressed in such a way that it is reasonably apparent that the [physician] intends to signify a  probability supported by some rational basis rather than mere supposition or speculation[.]" Duffen v. New York, 245 A.D.2d 653, 654 (3rd Dep't 1997) (internal quotation marks and citations omitted). Dr. Pressel's equivocal  testimony does not meet this standard.  On a continuum, his opinion falls far closer to "mere supposition or speculation" than it does to being supported by "some rational basis." See id.

The speculative nature of Dr. Pressel's opinion becomes even more apparent

_____

[9]     Another way in which it can be determined if a patient is having intermittent bouts of atrial fibrillation is through the use of an event recorder which is "more or less like a long-term Holter monitor[.]" Doc. 81 at 59.  It is a small recording device which a plaintiff carries with him, "and when the patient become symptomatic, they attach this device and it will record their rhythm at the time that they're having symptoms." Id.  "So," as Dr. Pressel stated, "even though the Holter monitor may be not informative, . . . because a patient's not having symptoms, frequently when you set them up with an event recorder . . . , many times you'll uncover arrhythmias that you didn't uncover with a Holter monitor." Id.

[10]     Unlike the doctors who testified on behalf of the United States, Dr. Pressel has not practiced in Syracuse.  He is a cardiologist in a two partner private practice in Towson, Maryland. Doc. 81 at 34.  This makes it difficult for the court to find that Dr. Pressel  was familiar with the standard of care in this community, especially given the lack of proof of same.

taking into account the record as a whole.   To be sure, Drs. Pressel, Nash and Phadke uniformly testified that if a patient clearly complains of atrial fibrillation and the doctor is made aware of same, the standard of care would require further evaluation or follow-up.  See Doc. 84 at 93 (Dr. Nash testified that complaints of atrial fibrillation  would have "to be followed up on in some fashion[,]" such as "seeing the patient, performing an electrocardiogram, examining the patient[.]"); Doc. 82 at 123 (Dr. Phadke explained that "if a patient ever complained . . . that he was having atrial fibrillation," he "would . . . entertain further investigations, including Holter monitor or possible an event monitor[.]"); Doc. 81 at 98 - 105 (Dr. Pressel opined that if plaintiff had told Dr. Phadke at least twice that plaintiff was "going in and out of atrial fib[,]" "it would be incumbent upon us as cardiologists to explore the possibility that this may be recurrent atrial fibrillation, and not to do so I think is a breach of the standard of care.") Significantly however, as noted earlier, during this January 21, 1998, visit, it is undisputed that plaintiff did not complain that he was "going in and out of A fib."  Doc. 82 at 123; see also Doc. 78 at 12.   Likewise, it is undisputed that  plaintiff did not complain of palpitations at that time. Id. at 122; see also Doc. 78 at 12.  Further, during Dr. Phadke's examination of plaintiff on that date, he did "not discern any abnormalities in the rhythm of [plaintiff's] heart[.]" Id. at 123-24.  Moreover, Dr. Phadke did order "further investigation" in the form of a stress test, to address the symptom of which plaintiff complained on that date -- shortness of breath upon exertion.  Dr. Pressel conveniently overlooks this fact.

It is axiomatic that a doctor does not have a duty to evaluate unspoken complaints. Therefore, it is only with the unfortunate advantage of hindsight (plaintiff's stroke) that Dr. Pressel was able to opine that Dr. Phadke "probably" should have ordered a Holter monitor and "perhaps" an event recorder.  This conjecture falls far

short of the proof necessary to convince this court by a preponderance of the evidence, as plaintiff must, that Dr. Phadke departed from acceptable standards of medical care by not "further investigating" the possibility that plaintiff had recurrent atrial fibrillation on January 21, 1998.

### 2.  January 22, 1998 - February 16, 1998

Dr. Pressel opined that it was not a breach of the standard of care for Dr. Phadke to allow plaintiff to return to work on February 17, 1998, with some restrictions.  Doc. 81 at 44.  By the same token, however, Dr. Pressel reiterated that although the February 12, 1998, stress test showed that plaintiff had "good exercise tolerance," he "*probably*  needed to have another Holter monitor and *could have* benefit[t]ed from a[n] event recorder if that Holter was unrevealing[.]" Id. at 95 (emphasis added).  He also suggested the possibility of performing "certain blood tests or lab tests[.]"  Id.  In short, Dr. Pressel agreed that "fail[ing]" to develop "a plan and then execute it to find out the cause of [plaintiff's] continued symptoms [*i.e.* shortness of breath] as of January and February of 1998" was "a departure from the reasonable standard of care[.]" Id. at 95-96.  Dr. Pressel continued: "[N]ot looking for . . . recurrent atrial fibrillation in this patient, who does have some increased risk for developing [same] . . . is, . . . a breach of the standard of care."  Id. at 96.

Starting again from the *assumption* that the standard of care required further evaluation during this time frame,  still, the court cannot find a departure from same. As with his prior testimony, Dr. Pressel's opinion is equivocal at best.  And, as was the situation on January 21, 1998, the record is void of any proof that plaintiff was complaining of atrial fibrillation between January 22 and February 16, 1998.

### 3.  February 17, 1998 - March 21, 1998

Later in his testimony, Dr. Pressel was asked the following question: "[D]o you

have an opinion within a reasonable degree of medical certainty as to whether the care provided by Dr. Phadke in the months of February and March of 1998, up through the date of [plaintiff's] stroke . . . , was in compliance with the appropriate standard of care?"  Doc. 81 at 100.  Dr. Pressel  repeated his belief that it was a "breach of the standard of care[]" not "to explor[e] the possibility" that plaintiff's symptoms "may be recurrent atrial fibrillation[.]" Id. at 105.  In contrast to his prior similar testimony, this time Dr. Pressel was responding to a hypothetical question.  His opinion was "[b]ased upon th[e] factual scenario" provided in that hypothetical, which explicitly included this assumption:  "[O]n at least two occasions, in the presence of his wife, [plaintiff] had seen Dr. Phadke between . . . February 17th and March 19th and that . . . he specifically advised Dr. Phadke that he felt that he was going in and out of atrial fib." Id. at 99.  For the reasons set forth earlier, the court does not find support in the record for this assumption.  Accordingly, because the record does not support the factual premise underlying this opinion, the court gives it little credence.  See Erbstein v. Savasatit, 711 N.Y.S.2d 458 (2nd Dep't 2000) (citations omitted) ("It is well settled that an expert's opinion must be based on facts in the record or personally known to the witness, and that the expert may not assume facts not supported by the evidence in order to reach his or her conclusion[.]") In sum, the evidence does not support a finding of liability against Dr. Phadke for failing to further investigate the possibility of recurrent atrial fibrillation and/or failing to diagnose same between January 21, 1998 and March 21, 1998.

### B.  Failure to Reinstate Anticoagulation Therapy

The tenuous nature of Dr. Pressel's opinion that the standard of care required Dr. Phadke to further investigate the possibility of recurrent atrial fibrillation between January 21 and March 21, 1998, becomes even more apparent when the focus shifts

to the issues of the claimed need to prescribe anticoagulation therapy and proximate cause.

### *1. Standard of Care*

As previously stated, "[t]o establish a prima facie case of liability in a medical malpractice action, a plaintiff must prove[,]" among other things, "the standard of care in the locality where the treatment occurred[.]" Fernandez, 809 N.Y.S.2d at 514 (internal quotation marks and citations omitted); see also Berk v. St. Vincent's Hospital and Medical Center, 380 F.Supp.2d 334, 342 (S.D.N.Y. 2005) (internal quotation marks and citations omitted) "[I]n order to show that the defendant has not exercised ordinary and reasonable care," in a medical malpractice action, *inter alia*, "the plaintiff ordinarily must show what the accepted standards of practice were[.]") As the United States is quick to point out, Dr. Pressel never explicitly testified that the standard of care in the Syracuse community in 1997-98 for a patient in plaintiff's condition required placing him on anticoagulant therapy. See Doc. 86 at 27.

Dr. Pressel did testify, however, that "*if* the [*plaintiff*] was *started on heparin* or - - . . . hospitalized and started on the heparin *or* certainly *started on Coumadin* at that point, I think within a reasonable . . . degree of medical certainty" this stroke "could have [been] prevented[.]" Doc. 81 at 106 (emphasis added). Likewise, Dr. Pressel's testimony can be read as inferring that the standard of care required that plaintiff be placed on anticoagulation therapy "from February on into March[.]" Id. at 109. On this point, Dr. Pressel testified that "if the event recorder and/or the Holter monitor demonstrated that [plaintiff] was in continuous A fib, . . . , and [he] could have been contacted, hospitalized, heparinized," then "within a reasonable degree of medical certainty" the stroke "could have [been] avoided[.]" Id.

Dr. Buchan testified to the contrary. In particular, Dr. Buchan testified that for

44

a patient under the age of 65 with no stroke risk factors (which Dr. Buchan believes describes plaintiff), anti-coagulation would *not* be recommended.  Dr. Buchan specifically testified that the "standard of care" in 1997-98 for deciding when anti-coagulation therapy is indicated is found in the Guidelines developed by the Consensus Conference on Antithrombotic Therapy of the American College of Chest Physicians ("ACCP"). Dr. Buchan described the ACCP Consensus Conference as, among other things, experts in the field of anti-coagulation therapy.  Dr. Buchan relies upon those ACCP Guidelines to make recommendations as to whether anti-coagulation therapy is indicated for a given patient.    The ACCP  publishes its Guidelines every three years.  Those in effect during the relevant time frame are from the Fourth Consensus Conference, published in 1995.  See Def. exh. J.

Further, Dr. Buchan testified that in accordance with those Guidelines, the decision to prescribe anticoagulation  therapy for patients under 65 is based upon the presence or absence of certain "risk factors."  Those risk factors are "previous TIA [transient ischemic attack] or stroke, hypertension, heart failure, diabetes, clinical coronary artery disease, mitral stenosis, prosthetic heart valves, or thyrotoxicosis." Id. at 357S and 358S.  Based upon those ACCP Consensus Conference Guidelines, Dr. Buchan opined that even for a patient who was in atrial fibrillation in February 1998, the "standard of care" or "acceptable treatment"  would have been to prescribe daily aspirin, and plaintiff was on aspirin at least as of February 23, 1998.  Anti-coagulation therapy was not mandated  in that situation because, as Dr. Buchan explained, even with atrial fibrillation, unless a patient had one or more of the risk factors listed above, he or she falls into the "low risk" category, *i.e.* an annual stroke rate of only 1.0%.

Dr. Stephen D. Nash concurred with Dr. Buchan's view that in February and

March of 1998, "the standard of care . . . for atrial fibrillation in the absence of other significant risk factors was aspirin daily[.]"  Doc. 84 at 6; see also id. at 47.   As did Dr. Buchan, Dr. Nash relied upon the ACCP Guidelines in reaching this conclusion. See id. at 48-50.  And like Dr. Buchan, Dr. Nash explained that in deciding whether to anticoagulate a patient, a doctor must carefully assess whether a patient "is more at risk of stroke than they are at risk for the bleeding complications" and "the need for continued and very close follow-up presumably forever[]" which are "associated with . . . anticoagulation."  Id. at 47 and 48.

Weighing the conflicting opinions as to whether the standard of care required prescribing anti-coagulation therapy, the court finds that the standard of care is that testified to by Drs. Buchan and Nash and found in guidelines developed by the ACCP Fourth Consensus Conference on Antithrombotic Therapy.  More specifically, in February and March 1998 the  standard of care for a Caucasian male under age 65 with no risk factors for stroke, even when presenting with atrial fibrillation, did not require prescribing anticoagulation therapy.

There are two particularly compelling reasons for adopting this standard of care here.  First, the court gives a great deal of credence to Dr. Buchan's opinion given her extensive experience and background with respect to anti-coagulation therapy, especially when juxtaposed with Dr. Presssel's relative lack of same.   Not only has Dr. Buchan been the Medical Director of the SUNY Upstate Anticoagulation Center since July 2001, but she  has participated in various projects and clinical trials pertaining to anticoagulation therapy.    Additionally, she lectures regularly on that subject to residents and colleagues.   Dr. Buchan also has extensive practical experience given that in her capacity as Director of the SUNY Upstate Anticoagulation Center she is literally called upon daily to assess whether to start or

discontinue a given patient on anticoagulants.

Admittedly, Dr. Nash does not have the extensive background and experience which Dr. Buchan has with respect to anti-coagulation therapy. He does, however, "practice preventive cardiology[]" in Syracuse, New York, and has a "faculty appointment at SUNY Upstate Medical Center[.]" Doc. 84 at 3. Dr. Nash also is "an attending physician and cochief of cardiology at St. Joseph's Hospital in Syracuse." Id. He is a Fellow in the "American College of Cardiology Elected[,]" as well as a Fellow in the ACCP, the entity which develops the Guidelines which the court has found define the relevant standard of care here. Def. exh. D at 2. Furthermore, unlike Dr. Pressel, Dr. Nash also relied upon the ACCP guidelines and demonstrated a working familiarity with same in rendering his opinion as to the applicable standard of care.

The qualifications of plaintiff's proffered expert, Dr. Pressel, are lacking in comparison. As previously alluded to, he is not from the Syracuse area. And in contrast to Drs. Buchan and Nash, he was not educated in New York; nor has he ever practiced here. Perhaps the court could overlook these facts if Dr. Pressel had testified along the lines of Dr. Buchan, *i.e.* that he has extensive training, background and clinical experience in prescribing anticoagulation therapy, but he did not. Nothing in his testimony or in his curriculum *vitae* persuades the court that he is uniquely qualified to testify regarding the circumstances under which anticoagulation therapy should be prescribed.

Second, Dr. Pressel did not testify that he was even aware of the Guidelines, much less offer a sound basis for disregarding same. Rather, in sharp contrast to Drs. Buchan and Nash, who defined the standard of care in terms of the ACCP Guidelines developed by leading physicians in the field of anticoagulation therapy, Dr. Pressel

relied upon  nothing more than his own subjective assessment of the record to articulate what he deemed to be the governing standard of care.  In sum, Dr. Pressel's relative lack of qualifications in combination with his disregard for the ACCP Guidelines severely undermines  his opinion that the standard of care mandated that plaintiff be placed on anticoagulants in the February through March 1998 time frame.

## 2.  *Departure from Standard of Care?*

Turning next to the issue of whether Dr. Phadke departed from the accepted standard of medical care because he did not prescribe anticoagulants during the "February on into March" time frame and/or a few days prior to March 21, 1998, obviously the court finds no such departure.[11]  As the preceding discussion makes clear, the standard of care during that time did *not* require prescribing anticoagulants for plaintiff.  In addition, to the extent plaintiff may have experienced atrial fibrillation during that time, at most it would have to be described as occasional based on this record.  Thus, in accordance with the ACCP Guidelines, even with such atrial fibrillation, the standard of care still did not require anticoagulation therapy.

Indeed, Dr. Pressel conceded as much on cross-examination. He readily agreed that "in a patient with Mr. Gerace's history of his age and characteristics at the time, that [even] if he was known and shown to be having *occasional bouts of atrial fibrillation* that the *standard of care would not require any kind of anticoagulation* to be provided to [plaintiff][.]" Doc. 81 at 109 and 162 (emphasis added).  Consistent with that view, on cross-examination Dr. Pressel further conceded that even if plaintiff was "having periodic bouts of atrial fibrillation that lasted short periods of time, less than an hour, and was having those bouts infrequently, once a week, that would *not*

---

[11]      Because this is the time frame during which Dr. Pressel claims that Dr. Phadke breached  the standard of care by not prescribing anticoagulation therapy, the court too has confined its analysis to this time frame.

be an *indication* for *anticoagulation*[.]" Id. at 162-163 (emphasis added).  Thus, Dr.
Pressel concurred that even if on March 19, 1998, plaintiff had informed Dr. Phadke
that he had awakened in atrial fibrillation the day before and "it [had] lasted for some
time," but that he was not in atrial fibrillation on March 19th, there was "no indication
for anticoagulation[.]" Id. at 164.

Similarly, even Dr. Pressel agreed that "the standard of care  would require that
before  you  would  anticoagulate  a  man  with  this  history  for  atrial  fibrillation  [*i.e.*
plaintiff], he would have to be known or documented to have been in atrial fibrillation
for at least 72 hours."  Doc. 81 at 162.  That is so because "the risk that atrial
fibrillation presents of stroke . . . is . . . not present until there has been continued a fib
for a period of[,]" in Dr. Pressel's words "[a]t least[]" . . . 72 hours[.]" Doc. 81 at 114.
What that meant for plaintiff, according to Dr. Pressel, is that "he would have had to
have been in atrial fibrillation continuously for at least three . . . days, probably even
longer than that, prior to the [stroke]." Id. at 107.  Dr. Pressel was unable to testify
with any certainty that plaintiff was in continuous atrial fibrillation, as he defined it,
during the relevant time frame, however.  Thus, even by Dr. Pressel's standards, there
would have been no reason for Dr. Phadke to have prescribed anticoagulants here.

Focusing on the "February on into March[]" time frame, Dr. Pressel testified
that he was "*fairly convinced* that with the continued complaints of the symptoms that
[plaintiff] had, if [plaintiff] would have had a Holter monitor and/or an event recorder
from February on into March, that we would have seen something there." Id.
(emphasis added).  Being "fairly convinced" that the use of those diagnostic tools
would have shown "something there[,]" is a far cry from being "fairly convinced" that
those tools would have shown that plaintiff was in continuous atrial fibrillation for at
least 72 hours prior to his stroke, requiring the use of anticoagulants.

49

Furthermore, in testifying that plaintiff's stroke could have been "avoided" if Dr. Phadke had prescribed anticoagulants for plaintiff in "January into February[,]" Dr. Pressel makes the wholly unfounded assumption that an event recorder and/or Holter monitor would have "demonstrated that [plaintiff] was in *continuous* A fib, A fib *all the time*[.]" Id. at 109 (emphasis added).  There is nothing in the record which comes even close to supporting such an assumption, however.

For example, when asked whether he had "an opinion within a reasonable degree of medical certainty whether . . . further testing, including Holter monitor followed up with, . . . a 30-day event monitor beginning in January of 1998. . . would have revealed *a period* of atrial fibrillation, thus causing initiation of treatment, based on his symptoms[,]" Dr. Pressel candidly replied, "I don't know."   Doc. 81 at 108 (emphasis added).  Dr. Pressel's testimony was similarly lacking in certainty when he addressed  the "January into February" time frame.  Id. at 108.  Although Dr. Pressel agreed that it was "quite possible" that a Holter monitor followed by an event recorder "would have revealed  a period of atrial fibrillation[]" then, he  was quick to note that plaintiff had "a stress test in the first part of February that showed that he was in normal rhythm[.]" Id.  Given that test result, Dr. Pressel acknowledged that if a Holter monitor was performed before that February stress test and/or if "an event monitor was performed prior to that time, . . . it would be *certainly possible* that it *could have been normal rhythm or episodes* of *maybe infrequent A fib*, much like we saw in the first Holter." Id. at 109 (emphasis added).  Obviously with a normal sinus rhythm, there would have been no need to "initiat[e] . . . treatment[,]" such as anticoagulation therapy.  See id. at 108.  In short,  Dr. Pressel "did not state, with any degree of medical certainty, or in any terms from which it [could] be said that [his] whole opinion reflect[ed] an acceptable level of certainty" that the plaintiff was in fact in

50

continuous atrial fibrillation during the relevant time frame, thus requiring anticoagulation therapy.  See Gross v. Friedman, 138 A.D.2d 571 2nd Dep't), aff'd 73 N.Y.2d 721 (1988) (internal quotation marks and citation omitted).

Perhaps anticipating that the court would find, as it has, that the ACCP Guidelines set the standard of care here, plaintiff's counsel attempted to discredit Dr. Buchan's opinion by suggesting that plaintiff had hypertension.  Hypertension is one of the stroke risk factors which the Guidelines note would render anticoagulation therapy appropriate, even in a male under 65 years of age.  See Def. exh. J at 358S. In the end, however, plaintiff failed in this attempt.  Dr. Buchan unequivocally testified that plaintiff "did  *not* have hypertension *within the meaning of the Guidelines* at any time during the period he was not on anticoagulants."  Therefore, as Dr. Buchan originally explained, the standard of care did not require anticoagulating him at any time during February and March of 1998.  Consequently, plaintiff has not met his burden of proving by a preponderance of the evidence that Dr. Phadke departed from accepted standards of medical care by failing to prescribe anticoagulants during that time frame.

### III.  Proximate Cause?

Assuming *arguendo* that plaintiff had been able to prove by a preponderance of the evidence that the standard of care required prescribing anticoagulants for plaintiff a few days prior to March 21, 1998, plaintiff still could not prevail here.  That is so because plaintiff  has not proven the third element necessary to sustain a medical malpractice action, *i.e.* that such departure was the proximate cause of his stroke.

The crux of Dr. Pressel's causation testimony is that if plaintiff had been started on anticoagulants "a few days prior" to March 21, 1998, his stroke could have been "prevented" or "avoided[.]"  Doc. 81 at 105-106.   Dr. Nash's contrary testimony

significantly undermine's this causation theory by showing how it is based upon nothing but conjecture.

Dr. Nash testified that even if plaintiff had been in atrial fibrillation on March 19, 1998, he is "not sure that Coumadin alone would have made any difference." Doc. 84 at 54.   That uncertainty stems from the fact that according to Dr. Nash "[i]t generally takes a number of days to achieve adequate anticoagulation." Id.  Dr. Nash further testified that even if plaintiff was placed on heparin, as Dr. Pressel suggested, he was "not certain that would have prevented a stroke[.]" Id.  Dr. Nash was not convinced that anticoagulating plaintiff even 48 hours before his stroke, *i.e.* on March 19, 2006, would have prevented this stroke because "that assumes you achieve adequate anticoagulation, which," Dr. Nash explained, "in real life rarely occurs within the first 24 hours[.]" Id.   If forced to make that unfounded assumption, Dr. Nash nonetheless was "not convinced, based on a reasonable degree of medical certainty, that it would have made any difference in this particular unfortunate circumstance." Id. at 55.  For one reason, as Dr. Nash was quick to agree, "there are people wh are on Coumadin at therapeutic dose who have a stroke nonetheless[.]" Id. at 51.

Shifting to heparin, the  primary reason offered by Dr. Nash as to why that anticoagulant administered even 48 hours prior to plaintiff's stroke would not have made a difference is that it does not dissolve pre-existing clots. See id. at 9.  Rather, what heparin does is "buy[]" a patient "time while [the patient's] body dissolves the . . . clot itself." Id. at 10.  So heparin is used "not . . . to help prevent [a] clot formation but to prevent [a] clot from forming in the first place." Id.  Thus, "[i]f a patient already ha[s] a clot in their heart, in their left atrium and you start[] putting them on heparin, you wouldn't necessarily get rid of the clot[.]" Id. at 93.  Given this

testimony, once again plaintiff has failed to meet his burden of proof – this time on the issue of causation.

### *Conclusion*

Undeniably, a stroke in a 46 year old man is a terrible and life-altering event. Nonetheless, the court must resist the temptation to engage in Monday morning quarterbacking. Instead, objectively examining the record the court finds that plaintiff Robert L.  Gerace did not meet his burden of proving by a preponderance of the evidence that Dr. Kishor V. Phadke departed from accepted standards of medical care. "Under the law, a plaintiff is not entitled to the best care available, but he must be afforded reasonable care." Jones v. United States, 1986 WL 1459, at * 6.  Dr. Phadke gave Mr. Gerace that care.  Accordingly, the court hereby directs that the Clerk of the Court enter judgment  in favor of Dr. Phadke and against plaintiff, dismissing this action in its entirety.

IT IS SO ORDERED.

August 10,  2006

Syracuse, New York

_____
Neal P. McCurn
Senior  U.S. District Judge